

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-21-00046-CV
_____


IN THE MATTER OF THE MARRIAGE OF
SADHNA M. PATEL AND SETH PARRISH
AND IN THE INTEREST OF A.K.P.P., A CHILD


On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-659830-19


Before Morriss, C.J., Stevens and Carter,* JJ.
Opinion by Justice Stevens


_____

*Jack Carter, Justice, Retired, Sitting by Assignment

# O P I N I O N

Mother filed for divorce from Father and sought sole managing conservatorship of their child, Ashok.[1]  After an evidentiary hearing, the trial court entered a decree of divorce that appointed Mother as Ashok's sole managing conservator and Father as possessory conservator. Even so, the trial court found that, "because of the extreme behavior exhibited by [Father], as described during testimony and exhibited during the trial, it [was] in the best interest of the child that [Father] not have any contact with the child until further order of the Court."

On appeal, Father argues that the trial court erred by denying him access to the child.[2] Because we agree, we reverse the trial court's conservatorship order and remand the matter to the trial court for further proceedings.  Even so, we affirm the remainder of the trial court's judgment.

## I.    Standard of Review

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (quoting TEX. FAM. CODE ANN. § 153.002). "[C]onservatorship determinations are 'intensely fact driven.'" *Id.* (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002)).  For this reason, "the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences

---

[1]We use a pseudonym for the minor child and his family members.  *See* TEX. R. APP. P. 9.9(a)(3); TEX. FAM. CODE ANN. § 109.002(d) (Supp.).

[2]Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.  *See* TEX. GOV'T CODE ANN. § 73.001.  We follow the precedent of the Second Court of Appeals in deciding this case.  *See* TEX. R. APP. P. 41.3.

that cannot be discerned by merely reading the record.'" *Id.* (quoting *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)). "A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function." *Id.* "The trial court's judgment will be reversed only when it appears from the record as a whole that the court has abused its discretion." *Id.*

"A trial court abuses its discretion when it acts 'without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably.'" *Id.* (alteration in original) (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)); *see Lee v. Melinda A.S.*, No. 02-14-00135-CV, 2015 WL 7820584, at *10 (Tex. App.—Fort Worth Dec. 3, 2015, no. pet.) (mem. op.). An abuse of discretion occurs when "[a] trial court . . . imposes restrictions that exceed those required to protect the child's best interest." *In re B.O.*, No. 02-16-00485-CV, 2017 WL 2590571, at *30 (Tex. App.—Fort Worth June 15, 2017, no pet.) (mem. op.) (citing *In re H.D.C.*, 474 S.W.3d 758, 764 (Tex. App.—Houston [14th Dist.] 2014, no pet.)).

## II.    Factual and Procedural Background

At trial, the court heard evidence that Father might have a mental illness and believed that he had passed along a medical condition, called cold urticaria, to Ashok. The evidence showed that Father's parenting and home treatment of Ashok for cold urticaria caused much discord in the marriage and led to family violence.

In June 2015, a month and a half before Ashok was born, Father was involved in a bad car accident and suffered four broken bones in his legs, a broken wrist or thumb, and injuries to

3

his cervical spine requiring a surgery to fuse three vertebrae. Mother testified that Father, a self-employed welder, was given Neurontin and Dilaudid and did not work throughout the marriage because he was recovering from the car accident.

Mother and Father married shortly after Ashok, who was five at trial, was born on August 8, 2015. Because Mother was fully employed with Texas Health Harris Southwest Hospital, Father took care of Ashok while she worked. In 2016, Father lost his sister to suicide and, according to Mother's sister, the house became a storage space for Father's deceased sister's belongings, was overcrowded, and was unlivable. Mother said that Father was diagnosed with bipolar disorder, PTSD, and social anxiety. Mother suspected that Father was suffering from mental health issues a year and a half into the marriage when he was "acting very weird in a bath saying that [Ashok] was down by the pool selling candy" even though the child was just a baby. Mother testified that she was not sure if Father's behavior was due to mental illness or the pain management medications he was prescribed after the car accident. According to Mother, Father was unstable during the entire marriage and was admitted to a facility for mental observation after threatening to commit suicide.

Father, who claimed to have cold urticaria, believed that he had passed this condition to Ashok. Shelly Harvey, a doctor at the University of Texas Southwestern Medical Center, testified that cold urticaria is a skin condition that causes itchy hives during exposure to cold. Mother testified that Father was convinced that Ashok had cold urticaria even in the absence of a diagnosis. The evidence at trial established that, even though the disease was triggered by exposure to cold, Father regularly refused to dress Ashok in appropriate clothing and that the

4

child was often seen in public without a shirt. Aunt, Ashok's maternal aunt, testified that Ashok would come to family gatherings wearing only diapers or underwear and would attend birthday parties dressed only in socks and shorts.

According to Mother, Father believed that the downstairs tiles were too cold for the child's feet and, as a result, would "flick" Ashok's hand "to teach him not to go towards the kitchen when most parents use gates" and prevented the child from going up and down the stairs. Mother said that Father gave Ashok too many baths in an effort to regulate his body temperature and "was too much of a disciplinarian." Mother said that he would spank the child even though he was two or three and that Father "said as long as there's no mark on the kid, then it's not abuse." According to Mother, Child Protective Services (CPS) intervened due to Father's alleged treatment of the child including "lack of clothing during really cold weather, having high AC during summers, him not being allowed to come downstairs because it's too cold for him, or him going into the back because it's too hot."

Mother testified that Father's treatment of Ashok for cold urticaria, including his failure to dress the child properly, resulted in many arguments. When asked if there was a history or pattern of domestic violence, Mother answered, "Yes. Mostly emotional, a little bit of physical." Mother testified that they both scratched and pushed each other when they argued. Mother also said Father had choked her and pushed her into a bush during an argument, which gave her a bruised hip. Mother had called the Fort Worth Police Department ten times and the Crowley Police Department two times. She testified that Father was arrested one time when an altercation

resulted in a mark on her face "because he swung his hand back when [she] knocked his phone out of his hand." The arrest resulted in a temporary protective order against Father.

Mother's other sister, who had lived with Mother and Father for a time, testified that she heard domestic violence. Sister said that Mother and Father engaged in a "screaming match" and that she threatened to call the police because Ashok was present in the home. Behind a closed door, Sister said she heard "raised voices and thuds, like something was being thrown," but clarified that Mother was throwing things. Sister testified that multiple domestic violence calls were made by both Mother and Father to police. Aunt testified that Mother told her there was domestic violence in the relationship and that she saw Mother with a black eye and a scab on her lip after Father was arrested. Aunt, who had intervened in the divorce proceedings and sought sole managing conservatorship of Ashok,[3] said that Father instigated the abuse and that she was afraid of Father, who had access to guns.

One of Mother and Father's arguments was witnessed by Harvey. Harvey testified that she had examined Ashok for signs of cold urticaria. During the examination, Father, who had briefly left the room, became very upset on returning when he saw that Mother had allowed Ashok to walk on the floor without socks. Harvey observed that Father immediately put the child's socks back on Ashok and began arguing with Mother, prompting Harvey to leave the room so things could calm down. Harvey's notes reflected Mother's statements that Father was overbearing and that there had been "domestic discord and multiple occasions when the -- the

_____

[3]The trial court appointed Aunt and her husband sole managing conservators until May 31, 2021, when Mother would receive sole managing conservatorship. That portion of the trial court's judgment is moot and not the subject of the appeal.

6

police had to be called to the house." Based on Mother's report and Father's behavior in the office, Harvey recommended that Father have a psychological evaluation.

Harvey also clarified that there was nothing dangerous or fatal about cold urticaria, that it was simply a skin condition that caused itching, which was typically treated with antihistamines, and that she saw no signs of cold urticaria in Ashok. Harvey also explained that there was no need for multiple baths, that there was no relationship between the disease and discipline, and that wearing less clothing would have a negative effect on people with cold urticaria.

The evidence also established that CPS had investigated six allegations involving Ashok. The case involved allegations that the Father had not properly dressed the child in cold weather. Claudine Griffith, a CPS worker, testified that the allegations in the sixth complaint involved domestic violence, Father's mental health, and an overabundance of caution about an undiagnosed medical condition. Griffith found that the home was cluttered and cold, that there was no heat in the house because the heating ducts were removed by Father, and that the child was only wearing shorts. As a result of voluntary placement, CPS removed Ashok from Mother's and Father's care and placed him with his maternal grandparents from October 2018 until March 2019. Ashok was then placed with his Aunt. Griffith testified that Father did not submit to a psychiatric evaluation despite concerns about his mental health, that he did not exercise his rights to supervised visitation, and that he "just refused to see [Ashok] at all during that time."

Mary Lou Almendarez, who was employed with Family Court Services in Tarrant County, testified that she was unable to observe Father with Ashok because he did not report for

visitation. Almendarez called Father to obtain his cooperation and said that Father came into the office twice, told Almendarez that he did not want to stay, and left. As a result, she was not able to interview Father and did not know where he lived. Almendarez said there were twelve domestic violence calls made to police between September 2, 2017, and January 25, 2019. She was concerned that Mother and Father would reunite and, because they had visited Colorado together during the pendency of the case, could be a flight risk.

Mother, who was attending counseling for domestic violence, testified that she had no intention of having any contact with Father and believed that he was a danger to her and Ashok. Mother requested that Father be appointed a possessory conservator but did not want him to have possession of and access to the child. Mother hesitated to say that Father loved Ashok because he had not made any effort to visit him, had not submitted to a psychological evaluation, and had not taken steps to treat his mental health.

Father testified that he was not aware that he had any mental-health diagnosis. He said that he loved his son and wanted custody of him but admitted that he could not remember the last time he had seen Ashok because he did not "want to visit with [his] son in the presence of people that lie[d] about [him]." Father said that he is "allergic to [his] sweat as well as cold temperature" and that his cold urticaria made him "break out in hives" that were not visible on his skin but were painful. When asked if he had changed his belief that Ashok suffered cold urticaria, Father replied that he could not assess the child's condition because he had not been caring for him. Father testified that he took great care to regulate the child's body temperature while he was in his care and that he bathed Ashok multiple times a day "to help him to bring his

8

cognitive functions back." Father, who admitted that he did not complete CPS's services, testified that he did not complete his interview with Family Court Services because he "was having issues with [his] own body up there. It was too hot at the top floor of the building."

Father testified that he had never physically abused Ashok but that Mother hit him "yet . . . busted [Father] over spanking [Ashok] correctly and appropriately." Father testified that Mother abused him, that she liked to "throw [his] items around [the] house," and that he had never slapped, kicked, or hit her. Father testified that he was living with his parents, who provided for him, and would reopen his welding business if the child were returned to him. Father said that he planned to move to Colorado because his body was relieved by the temperature there and that he and Mother had discussions about moving there if Ashok were returned.

Father, who had left in the middle of a prior trial related to Aunt's request for conservatorship, became argumentative on the stand. When asked what he was requesting the trial court to do, Father replied, "I have no request. I'm in a whirlwind of lies and just watching what the State of Texas does with the situation." When asked, "So you are requesting the Court to give you nothing today; is that correct?" Father said, "I'm requesting nothing." He later expressed his wish to have Ashok returned to him.

After hearing this evidence, the trial court entered a divorce decree that dissolved the marriage, appointed Mother sole managing conservator of Ashok, and appointed Father possessory conservator. Even so, the trial court ordered that "because of the extreme behavior exhibited by [Father], as described during testimony and exhibited during the trial, it is in the

best interest of the child that [Father] not have any contact with the child until further order of the Court." The trial court also ordered Father to pay child support.

## III. Relevant Law

"The court shall appoint as a possessory conservator a parent who is not appointed as a sole or joint managing conservator unless it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child." TEX. FAM. CODE ANN. § 153.191. Here, the trial court appointed Father possessory conservator. Father argues that, because the trial court did not find that his possession or access would endanger Ashok's physical or emotional welfare, the denial of access to Ashok constituted an abuse of discretion because "[t]he terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child." TEX. FAM. CODE ANN. § 153.193.[4]

---

[4]Mother did not file an appellee's brief in this case. To the extent the issue of family violence could be raised, the trial court's final order made no express finding of family violence. Moreover, the lack of any endangerment finding also impacts Father's rights to possession of and access to Ashok, despite the evidence of family violence. This is because although the Texas Family Code states that the trial court is to "consider the commission of family violence . . . in determining whether to deny, restrict, or limit the possession of a child by a parent who is appointed as a possessory conservator," and "may not allow a parent to have access to a child for whom it is shown by a preponderance of the evidence that . . . there is a history or pattern of committing family violence during the two years preceding the date of the filing of the suit or during the pendency of the suit," the Texas Family Code also states, "The terms of an order that denies possession of a child to a parent . . . may not exceed those that are required to protect the best interest of the child." TEX. FAM. CODE ANN. § 153.004(c)–(d) (Supp.), § 153.193. As a result, notwithstanding a finding of family violence,

 the court may allow a parent to have access to a child if the court:

  (1) finds that awarding the parent access to the child would not endanger the child's physical health or emotional welfare and would be in the best interest of the child; and

10

"Though courts sometimes use the words possession and access interchangeably, they are used differently in the Texas Family Code." *In re B.P., Jr.*, No. 2-07-251-CV, 2008 WL 2639264, at *7 (Tex. App.—Fort Worth July 3, 2008, no pet.) (mem. op.) (citing *In re Walters*, 39 S.W.3d 280, 284 (Tex. App.—Texarkana 2001, no pet.)). "A person with a right of access to a child may approach him, communicate with him and visit with him, but may not take possession or control of the child away from the managing conservator." *Id.* (citing *In re Walters*, 39 S.W.3d at 284–85). "A person with a right to possession of a child may exercise possession and control of the child, to the exclusion of all other persons, including the managing conservator, during periods of possession." *Id.* (citing *In re Walters*, 39 S.W.3d at 285).

"When a trial court appoints a parent possessory conservator, it can conclude that unrestricted possession would endanger the physical or emotional welfare of the child, but that restricted possession or access would not." *Id.* (citing *In re Walters*, 39 S.W.3d at 286). "A court can fashion a possession order that remedies the danger to the child's welfare by placing restrictions and conditions on possession or access." *Id.* (citing *In re Walters*, 39 S.W.3d at 286).

---

(2) renders a possession order that is designed to protect the safety and well-being of the child and any other person who has been a victim of family violence committed by the parent and that may include a requirement that:

(A) the periods of access be continuously supervised by an entity or person chosen by the court;

(B) the exchange of possession of the child occur in a protective setting; [or]
. . . .

(D) the parent attend and complete a battering intervention and prevention program . . . . or, if such a program is not available, complete a course of treatment . . . .

TEX. FAM. CODE ANN. § 153.004(d-1) (Supp.).

"Indeed, if the trial court appoints a possessory conservator, it may grant, deny, restrict, or limit the possessory conservator's possession of or access to the child." *Id.* "It may also grant, deny, restrict, or limit any rights, privileges, duties, and responsibilities with respect to the child as are necessary to protect the child's best interest." *Id.*

Even so, the "appointment of a parent as possessory conservator implies a finding that access by that parent will not endanger the physical or emotional welfare of the child." *Id.*; *see In re Walters*, 39 S.W.3d at 286–87 (noting that a court "cannot conclude . . . that access, even restricted access, would endanger the physical or emotional welfare of the child, because such a conclusion would prevent the trial court from appointing the parent possessory conservator"). For this reason, even though "a severe restriction or limitation is permissible if it is in the child's best interest," "Section 153.193 does not [typically] envision a complete denial of access." *In re Z.G.*, No. 02-19-00352-CV, 2021 WL 1229967, at *21 (Tex. App.—Fort Worth Apr. 1, 2021, no pet.) (mem. op.); *see Melinda A.S.*, 2015 WL 7820584, at *11 n.7.

"[T]he relationship between parent and child is constitutionally protected." *Fish v. Lebrie*, No. 03-09-00387-CV, 2010 WL 5019411, at *3 (Tex. App.—Austin Dec. 10, 2010, no pet.) (mem. op.) (alteration in original) (quoting *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978)). "[A] parent's right to the care and custody of his child is a fundamental liberty interest more precious than property rights." *Id.* (quoting *In re M.S.*, 115 S.W.3d 534, 547–48 (Tex. 2003) (citing *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982))). A "complete denial of access should be rare." *In re B.P., Jr.*, 2008 WL 2639264, at *7; *see In re J.J.R.S.*, 627 S.W.3d at 220. In other words, although "[t]rial courts have broad discretion to determine the frequency and

12

duration of visitation rights, "[a] complete denial of parental access should be reserved for situations rising nearly to the level that would call for a termination of parental rights." *In re B.O.*, 2017 WL 2590571, at \*30; *see In re P.M.*, No. 02-14-00205-CV, 2014 WL 8097064, at \*30 (Tex. App.—Fort Worth Dec. 31, 2014, pet. denied) (mem. op.). Denial of access is "reserved only for 'the most extreme of circumstances.'" *Fish*, 2010 WL 5019411, at \*3 (quoting *In re E.N.C.*, No. 03-07-00099-CV, 2009 WL 638188, at \*15 (Tex. App.—Austin Mar. 13, 2009, no pet.) (mem. op.) (citing *Hale v. Hale*, No. 04-05-00314-CV, 2006 WL 166518, at \*3 (Tex. App.—San Antonio Jan. 25, 2006, pet. denied) (mem. op.); *Green v. Green*, 850 S.W.2d 809, 812 (Tex. App.—El Paso 1993, no writ) (parent's entitlement to periodic visitation with child "cannot be denied except in extreme circumstances"))); *see Brandon v. Rudisel*, 586 S.W.3d 94, 107 (Tex. App.—Houston [14th Dist.] 2019, no pet.). "In such cases, we must find a balance between deferring to the trial court's factual determinations and carefully examining the record for evidence of extreme circumstances." *Fish*, 2010 WL 5019411, at \*3.

## IV. Analysis

The trial court's order denied Father access to Ashok. *See In re J.J.R.S.*, 627 S.W.3d at 220. "[C]ases involving complete denial of access are rare and usually reversed on appeal." *In re J.Y.*, 528 S.W.3d 679, 690 (Tex. App.—Texarkana 2017, no pet.) (quoting *Fish*, 2010 WL 5019411, at \*9).

For example, in *Fish*, there was ample evidence that father spanked his son regularly, spanked him harder for crying, would bruise the child during spankings, and would pinch the child hard enough to cause bruises. *Fish*, 2010 WL 5019411, at \*4. There was evidence that, on

13

one occasion, he strangled the child's puppy for urinating on the floor and spanked the child for crying when the puppy became unconscious. *Id.* The father also made the child watch R-rated movies while calling the child "a sissy," locked him in a room during visitation, gave the child a beer, and said he would relinquish parental rights if he did not have to pay child support. *Id.* Testimony at trial showed that the child was traumatized and afraid of the father, who regularly missed scheduled visits with the child. *Id.* Even so, the Austin court of appeals found that complete denial of access was an abuse of discretion. *Id.* at *10.[5]

Here, there was evidence of domestic violence between Mother and Father and evidence that Father may suffer from mental illness. The evidence also showed that Father failed to dress Ashok appropriately, was "too much of a disciplinarian," and engaged in questionable behaviors based on his belief that Ashok suffered from cold urticaria. Even so, there was evidence that Father cared for Ashok while Mother worked and that Father loved Ashok. Although CPS had become involved multiple times, Mother was the subject of some of the investigation, only one investigation concluded with a "reason to believe" finding against Father for neglectful supervision, and there was no evidence that the Department of Family and Protective Services had ever sought to terminate Father's parental rights.

---

[5]Courts have also held that complete denials of access were unwarranted in cases where (1) there was evidence that the parent had "pull[ed] a weapon on someone" and exposed the children to marihuana, (2) there was evidence of domestic violence in the presence of children, and (3) there was evidence the parent was an alcoholic who had passed out drunk while caring for the child alone. *Brandon v. Rudisel*, 586 S.W.3d 94, 109 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (citing *Hopkins v. Hopkins*, 853 S.W.2d 134, 138 (Tex. App.—Corpus Christi 1993, no writ) (affirming order giving father two hours of supervised visitation every other week; father had been convicted of drug delivery, used drugs in front of children, severely abused mother and threatened her with gun, hit older child, neglected children, denied treatment to child who suffered head injury while in father's care, kept extremely unsanitary house, and behaved erratically)); *see In re E.N.C.*, No. 03-07-00099-CV, 2009 WL 638188, at *16 (Tex. App.—Austin Mar. 13, 2009, no pet.) (mem. op.); *In re Walters*, 39 S.W.3d at 283.

14

After reviewing the entire record, we find that it "does not show parental unfitness so extreme that even supervised or limited parental contact or visitation would go against [Ashok's] best interest." *Brandon*, 586 S.W.3d at 109. The trial court did not find that Father endangered Ashok's physical health or emotional welfare and, instead, based Father's denial of access on "the extreme behavior exhibited by [Father], as described during testimony and exhibited during the trial." We conclude that this finding does not meet the standard for justifying a complete denial of access to a child. As a result, "though the evidence presented at trial would support a decision to limit [Father's] rights of access and possession, it does not demonstrate the presence of extreme circumstances needed to justify a denial of all access" to Ashok. *Fish*, 2010 WL 5019411, at *9 (quoting *E.N.C.*, 2009 WL 638188, at *16).

Also, the trial court is required to "specify and expressly state in the order the times and conditions for possession of or access to the child, unless a party shows good cause why specific orders would not be in the best interest of the child." TEX. FAM. CODE ANN. § 153.006(c). The "judgment must state in clear and unambiguous terms what is required for the conservator to comply." *In re J.J.R.S.*, 627 S.W.3d at 224 (citing *Hale v. Hale*, No. 04-05-00314-CV, 2006 WL 166518, at *3 (Tex. App.—San Antonio Jan. 25, 2006, pet. denied) (mem. op.) ("If a trial court determines that it is in the best interest of the child to place restrictions or conditions on a conservator's rights of possession and access, then it is the court's responsibility to specifically define those terms in its decree.")). The trial court's judgment bars contact with Ashok "until further order of the Court," without providing any clarification as to what Father must do to regain access to Ashok. As a result, the judgment "does not meet the standards for

15

enforceability." *Hale v. Hale*, No. 04-05-00314-CV, 2006 WL 166518, at *3 (Tex. App.—

San Antonio Jan. 25, 2006, pet. denied) (mem. op.); *see In re Walters*, 39 S.W.3d at 288.

We sustain Father's sole point of error.

## V.       Conclusion

We reverse the trial court's conservatorship order and remand the matter to the trial court

for further proceedings, including consideration of what amount and kind of access is appropriate

under the circumstances of this case and what safeguards are necessary to protect the child's

well-being.  We affirm the remainder of the trial court's judgment.

<br>

Scott E. Stevens
Justice

Date Submitted:       December 23, 2021
Date Decided:         March 10, 2022